IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 25, 2010

## STATE OF TENNESSEE v. MICHAEL JERMAINE HARRIS

**Appeal from the Criminal Court for Hamilton County**
**No. 258567      Don W. Poole, Judge**

_____

**No. E2009-01383-CCA-R3-CD - Filed August 10, 2010**

_____

A Hamilton County jury convicted the defendant, Michael Jermaine Harris, of one count of aggravated arson. The trial court sentenced him to 19 years' incarceration to be served at 100 percent as a violent offender. The defendant appeals his conviction and argues that the evidence was insufficient to support his conviction, that the trial court erred in failing to give a proper jury instruction regarding eyewitness identification, and that the trial court erred in enhancing his sentence on the basis of factors not determined by the jury. Discerning no error, we affirm the judgment of the Hamilton County Criminal Court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Jonathan Turner, Chattanooga, Tennessee (on appeal); and Ardena Garth, District Public Defender (at trial), for the appellee, Michael Jermaine Harris.

Robert E. Cooper, Jr., Attorney General and Reporter, Matthew Bryant Haskell, Assistant Attorney General; William H. Cox, District Attorney General; and Neal Pinkston, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On December 24, 2005, a home at 2104 East Thirteenth Street in Chattanooga was set on fire while people remained inside the structure. On April 26, 2006, a Hamilton County grand jury indicted the defendant for the aggravated arson of the residence. After a trial on February 24, 2009, the jury convicted the defendant as charged. The trial court held a sentencing hearing and sentenced the defendant to 19 years' incarceration at 100 percent

service. The defendant filed a timely motion for new trial and notice of appeal.

At trial, Danny Westfield testified that in December 2005, he lived at 2104 East Thirteenth Street in Chattanooga. He explained that the home was a duplex and that he lived on one side, Apartment A, with his girlfriend, Tina Watkins; her brother, Fred Bowen; and his grandson, Demetrius Buchanan. He said that Gail Lee lived in the other side of the duplex, Apartment B. Mr. Westfield stated that he had lived in the duplex for 11 years.

Mr. Westfield testified that on December 24, 2005, he was visiting Ms. Lee's side of the duplex and that "a house full" of people were present to celebrate Christmas. He said that his son, Danny,[1] arrived at the duplex near dusk and that the defendant arrived shortly thereafter. Mr. Westfield testified that he knew the defendant "from the neighborhood." He said that Danny and the defendant began fighting shortly after arriving at Ms. Lee's apartment.

Mr. Westfield testified that "the fight started on the inside and [they] took it on the outside." He said that he did not know why the men were fighting. He estimated that the fighting lasted for approximately five minutes. He testified that he owned a pit bulldog that bit the defendant during the scuffle. Mr. Westfield testified that he attempted to stop the fight and that he "ended up shooting [the defendant]." He thought he shot the defendant in either the hip or leg with his .32 revolver. He testified that the fighting then stopped and that the defendant left.

Mr. Westfield and his son also fled from the residence after the fight. He said that he did not contact the police about the incident. Mr. Westfield pleaded guilty to one count of reckless endangerment for his shooting the defendant.

Mr. Westfield testified that he returned to his home on December 27, 2005, and observed that his side of the duplex had been burned. He testified that he never gave the defendant permission to burn the home.

Ms. Lee testified that she lived in Apartment B at the duplex on East Thirteenth Street. She testified that in December 2005, she had lived there for approximately three years. She said that on Christmas Eve she was in her kitchen making chicken and dressing and that her grandson and daughter were in her living room. She said that Mr. Westfield and Mr. Bowen were also present. Ms. Lee testified that she heard "a lot of motion up front," that she witnessed the defendant and Danny fighting, and that the two turned over her coffee

[1]Although it is the policy of this court to refer to people by their surnames, in this case we distinguish Mr. Westfield from his son by referring to his son by his first name, Danny.

table.  She said that the two also knocked over her unlit kerosene heater and spilled kerosene on the floor.  She testified that she knew the defendant and that she did not invite him to her home that evening.

Ms. Lee testified that the fight moved outside and that Danny ran into his father's apartment on the other side of the duplex.  Ms. Lee then observed the defendant use his foot to try to break the windshield of Mr. Westfield's vehicle.  She said that the defendant then tried to enter Apartment A but that Mr. Westfield pushed him back.  She then saw a dog run outside and chase the defendant.  Ms. Lee stated that she then ran into the house to call 9-1-1 and that she heard three gunshots.  Ms. Lee said when she ran back outside a group of unidentified males had taken the defendant and "then went on up the street."  She said that Mr. Westfied and Danny remained in the front yard.  Ms. Lee said that the police arrived and that she spoke with them.

She testified that, after the police departed, the defendant and a group of males returned.  She said that the defendant told her to "set [her] stuff out" because he was going to burn down the house.  Ms. Lee told the defendant to go to the hospital because of his gunshot wound, but the defendant was "just cussing" about how Mr. Westfield had shot him.

Ms. Lee said that the defendant then returned with a larger group of men and that he knocked on Apartment A's door, but nobody answered.  Ms. Lee was inside her apartment when she heard the group of men talk about "shooting up" the house, and she again went outside.  While outside, she saw Ms. Watkins open her door.  The defendant exclaimed that Mr. Westfield had shot him three times and then showed her the wound on his leg.  After the defendant left, Ms. Lee discussed with Ms. Watkins whether the defendant would actually burn the house.  They decided he would not do such a thing and entered their respective apartments.

Ms. Lee said the defendant again came to the home.  She said, "So him and some boys were going up the street and he stopped a car and he asked him to take him to the Conoco to get some kerosene, not kerosene, gasoline, because he fixing to burn the house down."  She testified that the defendant returned 10 to 15 minutes later with a clear "milk jug or something" with something "pinkish" inside it.  She testified that she ran to Apartment A to tell Ms. Watkins to call the police.

Ms. Lee testified that she told the defendant, "I know you ain't fixing to do what I think you're fixing to do."  She said that the defendant replied, "Well, I told you to set your stuff out."  She then heard the defendant shout, "My sister dead, my sister dead, I don't care nothing about nothing no more."  She said that the defendant picked up the jug and "dashed it on the side real quick" of Apartment A.  She again said, "I know you ain't fixing

to set this house on fire," and the defendant responded, "Yes, I am too." She testified that he then threw a cigarette lighter to ignite a fire at Apartment A and that "the whole door looked like it just blowed off." Ms. Lee stated that Ms. Watkins and Mr. Bowen were both in the home when the defendant ignited the fire. She said that the defendant then ran into an alley.

She testified that, when she saw police officers, she ran to them and told them to call the fire department. She saw Ms. Watkins exit her home "hollering and screaming and stuff." Ms. Lee testified that she also gave a statement to fire department personnel that evening. Ms. Lee said that as a result of the fire, she had to stay with relatives for three weeks; however, she said that nothing in her home was damaged and that she eventually returned to living there.

On cross-examination, Ms. Lee stated that the defendant had worn an orange jumpsuit on the night of the burning and that he had worn it all day. She also said that she spoke to the police prior to the arson and estimated that the burning occurred at 11:00 or 11:30 p.m.

Ms. Watkins testified that she lived in Apartment A with her brother, Mr. Bowen; her boyfriend, Mr. Westfield; and Mr. Westfield's grandson, Mr. Buchanon. She explained that her brother, Mr. Bowen, had only one leg and walked by use of a wooden leg.

Ms. Watkins testified that she was sleeping on December 24, 2005, and was unaware of any altercation next door in Apartment B. She stated that she was asleep in the living room when she awoke to her neighbor's telling her to call the police because somebody threatened to burn down her house. She testified that she was on the telephone with the police when the fire started. She said that the front door "blew up" and that she then ran to the back of the apartment, collected her dog, and called for her brother, who was in the back room. She said that she and her brother left through the back door.

Ms. Watkins said that the fire department quickly extinguished the fire but that everything in the home was ruined. She testified that she knew the defendant and that she never gave him permission to burn the house.

Christian Lorenzen of the Chattanooga Police Department testified that he was patrolling the area when he observed a home on fire at approximately 10:00 or 10:30 p.m. He drove toward the fire and observed an individual throwing some sort of liquid on the fire that increased its intensity. He watched the fire "rolling up the house." Officer Lorenzen exited his vehicle and chased the individual; however, the man ran out of sight. He identified the individual as the defendant. Officer Lorenzen testified that he then attended to the

burning home and that after ascertaining that Ms. Watkins and Mr. Bowen were outside the duplex, he focused on controlling the crowd that had formed around the duplex.

Officer Lorenzen testified that he received a call from Park Ridge Hospital that a man had arrived who had a gunshot wound and smelled of kerosene. Based upon what he had learned during his interviews at the scene, he went to the hospital. He identified the man at the hospital as the defendant, the same man he had chased earlier that evening. He estimated that he visited the hospital at approximately 12:00 a.m.

On cross-examination, Officer Lorenzen described the man that he observed at the fire as a black male with short dreadlocks, dark colored jeans, and a sweatshirt. He could not recall the color of the sweatshirt. He said that he identified the suspect at the hospital by the color of his jeans, his hair, and the smell of a flammable liquid that he believed was kerosene. He testified that the hospital treated a gunshot wound in the victim's thigh. He said that the defendant had a weapon on him at the hospital.

Officer Lorenzen maintained that he did not question the defendant at the hospital; however, he testified that he asked the defendant, "Why'd you run from me?" and that the defendant responded, "Oh man."

Lieutenant Henry McElvain of the Chattanooga Fire Department testified that he investigated the December 24, 2005 fire. He testified that the incident was reported to the fire department at 10:38 p.m. He arrived at the scene and noted that Apartment A of the duplex had been damaged. He first interviewed Ms. Lee, who told him that the defendant had been in a fight at the residence earlier and that he had set the fire.

Lieutenant McElvain testified that most of the fire damage was in the front doorway of Apartment A. He described a "V pattern" going up and out the building. He said that the fire burned the front door and spread to the interior of the home, blackening the ceiling. He determined that the origin of the fire was the front porch area.

Lieutenant McElvain collected debris samples for later examination by the Tennessee Bureau of Investigation ("TBI"). He testified that another member of the fire department went to the hospital and collected clothing from the defendant for later examination by the TBI.

Randall Kirk Nelson of the TBI crime laboratory in Nashville testified that he performed an analysis of the debris and clothing collected by the Chattanooga Fire Department. The trial court accepted Agent Nelson as an expert in micro analysis. Agent Nelson's testing of the debris from Apartment A indicated the presence of an evaporated

gasoline product. He also examined the defendant's shoes and clothing, which indicated the presence of an evaporated heavy petroleum distillate. He said such distillates include kerosene, diesel fuel, and some charcoal starters.

Agent Nelson admitted that the incendiary agent found from the debris was wholly different than that found on the defendant's clothing. He further testified that nothing indicated that a mixture of a gasoline product and a heavy petroleum distillate was used.

The State rested, and the defense presented Lela McFarrin, the director of medical records at Park Ridge Medical Center. She explained that she gathered records and processed them for the hospital. She received a request to locate the medical records of the defendant, Michael Harris, for a December 24 or 25, 2005 visit. She testified that she initially could not find the defendant's hospital records but that, upon learning additional information about his visit, she identified records for "Michael Blunt." She also noted that the date of birth and social security number written for "Michael Blunt" matched that of the defendant. She also explained that the registration form originally stated "Michael Harris" but "Harris" had been crossed through and "Blunt" written instead.

On cross-examination, Ms. McFarrin stated that she did not know who filled out the registration form, so she was unaware of who crossed through the defendant's last name. She also acknowledged several inconsistencies in the hospital records. She noted that the time of 10:30 p.m. was hand-written as the arrival time; however, other records indicated an arrival time of 11:20 p.m., a "triage time" of 11:20 p.m., and an "admission time" of 11:41 p.m. Ms. McFarrin admitted that the reported admission times were inconsistent and that human error could occur in the record-making process.

Paula Burgess, a registered nurse, testified that she was working at Park Ridge Medical Center's emergency room on December 24, 2005. She testified that she treated the defendant's gunshot wound on that evening, but she said that she mainly recalled the treatment through her records. She recalled that the defendant arrived via private vehicle, and she testified that generally when a patient arrived with a gunshot wound, he was immediately treated. She testified that the person who arrived at the hospital with the defendant likely filled out the registration form reflecting "Michael Blunt."

Ms. Burgess addressed the medical forms noting the treatment received by the defendant. She testified that she had crossed out the time of 11:20 p.m. and replaced it with 10:30 p.m. written in her handwriting. She testified that when several nurses treat one patient, it is common for inconsistent and inaccurate times to be reported. She acknowledged that the "Time to TX Room" entry originally said 10:30 p.m. in her handwriting but that someone had crossed it out and written 11:30 p.m. Ms. Burgess testified that her records

-6-

reflected that she started intravenous therapy on the defendant at 10:38 p.m. and that laboratory assistants arrived to draw blood at 10:40 p.m. She testified that she had written that the police were notified of the gunshot injury at 10:50 p.m.

Ms. Burgess explained that she had "a habit of writing on napkins and transferring that" to the hospital records. She said that she developed this habit because, in an emergency treatment situation, she did not have time to make official documentation while tending to the patient. She testified that, after she entered her "scrap" notes into the official records, she disposed of the loose notes.

On cross-examination, Ms. Burgess again acknowledged that the triage time and arrival time stated 11:20 p.m. and that, because of the type of wound, these times would be identical because treatment would start immediately upon arrival. She explained that the computer program used for entering medical records automatically entered the time. She said that, because she generally makes her records after the treatment, the automatically-displayed time is generally much later than the actual procedures and that she has to change it. Ms. Burgess also testified that she heard the defendant say "they poured gasoline all over me."

Chris Gaynor testified that he maintained recordings and records for the 9-1-1 center and the computer aided dispatch system ("CAD"). He explained that the CAD entries recorded the calls to and from the police involving reported incidents. He testified that on December 24, 2005, the police were contacted regarding Mr. Westfield's shooting the defendant at 9:28 p.m. and that they were contacted regarding the arson at 10:37 p.m. The CAD entries reported that someone with an orange shirt threw something in the house and set it on fire. He said the records reflected a police officer was on foot at the scene at 10:40 p.m. The CAD entries noted that the defendant was at Parkridge Hospital at 11:21 p.m., that he was identified at 11:22 p.m., and that an officer observed the defendant at the hospital at 11:58 p.m. On cross-examination, Mr. Gaynor stated that the call from the hospital about the reported gunshot occurred at 10:55 p.m.

Based on the evidence as summarized above, the jury convicted the defendant of aggravated arson.

At the sentencing hearing, several witnesses testified that the defendant was a good person and that they did not believe that he set the fire. The defendant gave an allocution in which he explained that the hospital records showing his presence in the emergency room at 10:30 p.m. proved that he could not have possibly started the fire at 10:37 p.m. The State argued that the defendant had prior convictions in excess of those required for his range, that the arson affected multiple victims, that the defendant had no hesitation in committing a crime that risked human life, and that he had been unsuccessful in

community-based sentencing in the past. The State also noted that the defendant was on probation when he committed the instant offense.

As mitigating factors, the trial court considered that the defendant's sister was murdered, that her murder affected his personal life, and that a conflict preceded the arson. As enhancement, the court noted that although the defendant had no prior felony convictions, he had seven prior "fairly serious" misdemeanor convictions. The trial court gave slight weight to the crime's having multiple victims. It noted that the defendant had failed to comply with the conditions of probation at least four times, including in the current case. The trial court ordered the defendant to serve 19 years' incarceration.

## *Issues on Appeal*

The defendant presents three issues on appeal. First, he challenges the sufficiency of the evidence. Second, he avers that the trial court erred by failing to give proper jury instructions on eyewitness identification. Lastly, he challenges the trial court's enhancement of his sentence based on factors not found by a jury.

## *I. Sufficiency of the Evidence*

The defendant challenges the sufficiency of the convicting evidence, arguing that "the evidence clearly could not exclude the hypothesis of mistaken identity where defendant was at the emergency room . . . at 10:30 p.m. . . . when the fire was observed by Officer Lorenzen being set at 10:37 p.m." The defendant does not challenge proof of the statutory elements of aggravated arson, but rather, he argues the evidence does not establish his identity as the arsonist. The defendant argues that his conviction was based on circumstantial evidence and that the evidence must be "so strong and cogent as to exclude every other reasonable hypothesis except that the defendant is guilty." *See State v. Crawford*, 470 S.W.2d 610, 612 (Tenn. 1971) (stating that before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant"). The State argues that "ample direct evidence" supported the jury's verdict. We agree with the State.

A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict because a guilty verdict destroys the presumption of innocence and replaces it with a presumption of guilt. *See State v. Evans*, 108 S.W.3d 231, 237 (Tenn. 2003); *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court must reject a defendant's challenge to the sufficiency of the

evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. *See Carruthers*, 35 S.W.3d at 558; *Hall*, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Issues of the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this court will not re-weigh or re-evaluate the evidence. *See Evans*, 108 S.W.3d at 236; *Bland*, 958 S.W.2d at 659. This court may not substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. *See Evans*, 108 S.W.3d at 236-37; *Carruthers*, 35 S.W.3d at 557.

Although a criminal offense may be established exclusively by circumstantial evidence, *Duchac v. State*, 505 S.W.2d 237 (Tenn. 1973); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003), we disagree with the defendant's argument that only circumstantial evidence supported his conviction. Ms. Lee, who had known the defendant, testified that the defendant was shot during a fight at her home and that he later returned and announced his intentions to burn down Mr. Westfield's side of the duplex. The defendant told Ms. Lee to remove her possessions from the home, and he stopped a vehicle to take him to a gas station. She said that she observed him throw liquid onto the home and set it on fire. "[T]he question of identification of a defendant as the person who committed the offense is a question for the jury, and a victim's identification alone is sufficient to support a conviction." *State v. Toomes*, 191 S.W.3d 122, 130 (Tenn. Crim. App. 2005) (citing *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)). Further, Officer Lorenzen watched the defendant throw a liquid on the home that increased the flames, and then the officer pursued the defendant, later identifying him at the hospital.

The jury obviously credited this evidence over the medical records provided at trial. The records were inconsistent, and the jury was within its purview in discrediting the time entries representing that the defendant arrived at the hospital before the arson. Viewing the evidence in a light most favorable to the State, we must affirm the guilty verdict for aggravated arson.

## II. Jury Instruction

The defendant next argues that the trial court erred in failing to provide a

*Telfaire* instruction[2] regarding identification. The defendant, however, failed to present this proposed jury instruction at trial and did not object to the trial court's failure to give such an instruction. Before he will be entitled to relief, a defendant challenging the omission of an instruction must make a special request that the instruction be given or otherwise object to the omission. *See* Tenn. R. Crim. P. 30(a), (b); *State v. Cravens*, 764 S.W.2d 754, 757-58 (Tenn. 1989); *State v. Haynes*, 720 S.W.2d 76, 84-85 (Tenn. Crim. App. 1986); *Bolton v. State*, 591 S.W.2d 446, 448 (Tenn. Crim. App. 1979). Also, the defendant failed to include any reference to the issue in his motion for new trial. *See* Tenn. R. App. P. 3(e) (stating that "in all cases tried by a jury, no issue presented for review shall be predicated upon error in . . . jury instructions granted or refused, . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived"); *State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial but were not raised in the motion); *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). Thus the instruction issue is waived.

### III. Sentencing

The defendant claims that the trial court erred by enhancing the defendant's sentence to 19 years "on the basis of enhancement factors not determined by the jury." When considering a challenge to the length of a sentence this court conducts a de novo review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d) (2003). Our case law has long held that the presumption of correctness "'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" *State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991)). The appealing party, in this case the defendant, bears the burden of establishing impropriety in the sentence. T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also Carter*, 254 S.W.3d at 344; *Ashby*, 823 S.W.2d at 169. If our review of the sentence establishes that the trial court gave "due consideration and proper weight to the factors and principles which are relevant to sentencing under the Act, and that the trial court's findings of fact . . . are adequately supported in the record, then we may not disturb the sentence even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

---

[2]The defendant refers to a jury instruction involving eyewitness identification as promulgated by *United States v. Telfaire*, 469 F.2d 552, 556 (D.C. Cir. 1972). Our supreme court has held that "the *Telfaire* instruction . . . is not appropriate because it impermissibly comments on the evidence; thus, invading the province of the jury." *State v. Dyle*, 899 S.W.2d 607, 610 (Tenn. 1995).

First, we note that the defendant argues that the trial court's use of non-jury-determined facts to enhance his sentence runs afoul of *Blakely v. Washington*, 542 U.S. 296 (2004), and its progeny. However, the 2005 version of the sentencing law, pursuant to which the defendant was sentenced, complies with Sixth Amendment principles. *See Cunningham v. California*, 549 U.S. 270, 294 n.18 (2007) (citing the 2005 version of Tennessee Code Annotated section 40-35-210(c) as a statute that "permit[s] judges genuinely 'to exercise broad discretion . . . within a statutory range,' which 'everyone agrees' encounters no Sixth Amendment shoal'"); *Carter*, 254 S.W.3d at 343 (Tenn. 2008) (stating that the 2005 amendments were enacted "[i]n order to avoid the constitutional violation arising from a trial court['s] increasing a presumptive sentence on the basis of judicially-determined enhancement factors").

Next, our review of the record shows that the trial court properly considered our sentencing scheme in determining the defendant's 19-year sentence. The trial court properly considered the defendant's extensive criminal history, *see* T.C.A. § 40-35-114(1), his failure to comply with conditions of sentences involving release into the community, *see id.* § 40-35-114(8), and that he was on probation when he committed the arson, *see id.* § 40-35-114(13). We will not disturb the enhanced sentence ordered by the trial court.

*Conclusion*

The evidence sufficiently establishes the defendant's identity as the arsonist. The defendant has waived his argument that the trial court erred in failing to give a *Telfaire* instruction. Lastly, we uphold the trial court's ordering a 19-year sentence. The judgment of the Hamilton County Criminal Court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE